**MOORE v. MARINES et ux. (No. 7279.)**

(Court of Civil Appeals of Texas. San Antonio. Feb. 11, 1925. Rehearing Denied March 4, 1925.)

**1. Appeal and error ⬛1003—Jury's finding upheld unless contrary to overwhelming weight of evidence.**

The appellate court must look most favorably upon testimony tending to support jury's finding and uphold such finding unless evidence to contrary is overwhelmingly against it.

**2. Mines and minerals ⬛74—Evidence held to sustain finding that no parol contract for sale of oil and gas royalties was made.**

Evidence *held* to sustain finding that there was no meeting of minds and no parol contract whereby defendant agreed to sell interest in gas and oil royalties.

**3. New trial ⬛99—New trial for newly discovered evidence properly denied, where evidence of negative character, no diligence shown, and one of proposed witnesses actually testified.**

New trial for newly discovered evidence *held* properly denied, where testimony was of a negative character and immaterial and would not probably change result of trial, no diligence was shown, and one of proposed witnesses had testified on trial.

**4. Principal and agent ⬛22(1)—Statements of third person that he was acting as defendant's agent held inadmissible, where uncontradicted evidence showed contrary.**

Testimony that one P. told plaintiff and his attorney that he was acting as agent of defendant was inadmissible, especially where whole record tended to show that he was a partisan of plaintiff and there was uncontradicted testimony that he was not defendant's agent.

**5. Trial ⬛122—Comment on failure of alleged agent to testify held proper where he was present at trial but not called as a witness.**

Defendant's counsel *held* warranted in commenting on failure of one, alleged to have stated he was defendant's agent, to testify, where he was present at trial but not called by plaintiff to prove such alleged agency.

Appeal from District Court, Guadalupe County; Lester Holt, Judge.

Suit for specific performance by John W. Moore against Leopoldo Marines and wife. Judgment for defendants, and plaintiff appeals. Affirmed.

Rainbolt & Hopkins, of Gonzales, and Wurzbach & Wirtz, R. A. Weinert, and A. J. Wirtz, all of Seguin, for appellant,

Dibrell & Mosheim, of Seguin, L. Broeter, of Alice, Nelson Puett, of Luling, and E. B. Coopwood, of Lockhart, for appellees.

SMITH, J. In this suit appellant, Moore, sought to enforce specific performance of an alleged parol contract to purchase an undivided one-fourth interest in the royalty to be derived from oil and gas operations upon a tract of land situated in Guadalupe county and owned by appellees, Leopoldo Marines and wife, Escolastica Marines.

It was alleged by appellant that he entered into an oral agreement with Leopoldo Marines late in the afternoon of December 28, 1923, whereby he was obligated to pay Marines $3,000 in cash for the interest; that it was further agreed that appellant and the Marines were to meet in Luling on the following morning and incorporate the agreement into a formal written contract or conveyance, but that the Marines failed and refused to carry out this agreement. The Marines denied that they made the alleged agreement and asserted that the royalty in controversy was the separate property of Escolastica Marines, wife of Leopoldo, and that therefore the alleged agreement of the latter, if made, could not bind the former.

The cause was tried by a jury, who found in response to special issues submitted to them: First, that Leopoldo Marines did not make the alleged agreement to sell the royalty to appellant; and, second, that said royalty was not the separate property of Escolastica Marines, wife of Leopoldo. Upon these findings the court rendered judgment in favor of the Marines against Moore, who has appealed. Appellant presents his appeal upon three propositions of law, which will be disposed of in the order presented.

It is first contended that the finding of the jury that the parties did not make the alleged agreement of purchase and sale "is against the great weight and preponderance of the evidence, and is evidently the result

---

⬛ For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of passion or prejudice, or gross mistake of judgment on the part of the jury." Theoretically this proposition calls for a consideration of the entire statement of facts, but as each party in his brief has quoted quite liberally from the evidence, each endeavoring to sustain his contentions, we have assumed that all of the material evidence on both sides is embraced in the briefs, and have therefore limited our investigation to those sources.

[1] We are required under well-established rules to look most favorably upon the testimony tending to support the jury's findings, and under that test to uphold those findings if they appear to be founded upon material and substantial evidence; unless, indeed, the evidence to the contrary preponderates so overwhelmingly that no reasonable mind could disregard the one and give effect to the other, or reconcile the two so as to support the jury's findings. · Nothing has been pointed out to us in the record to indicate that the jury was actuated by prejudice or passion or "gross misjudgment," or to account for the presence of such considerations in the minds of the jury. No untoward incident in the trial is disclosed; no unusual circumstance or condition or conduct among the parties, or witnesses, or counsel, is apparent from the record, by which the jurors may or could have been influenced. It appears to be essentially an ordinary fact case, and we are relegated to a careful scrutiny of the bald record of the testimony as the sole means of determining the controlling questions presented.

[2] The conversation out of which the alleged agreement arose was witnessed and participated in by four persons, appellant Moore, his friend C. E. Dilworth, and one Frank Putgenat, on the one hand, and appellee Leopoldo Marines on the other. On that occasion appellant, accompanied by Dilworth and Putgenat, drove out to the Marines' home a few miles in the country from Luling, for the purpose of trying to purchase the royalty in controversy. Appellant and Dilworth were strangers to the Marines, but the latter was acquainted with Putgenat. Marines had never discussed the matter with any of them; they went to see him upon their own initiative without previous notice to him. An oil well had been brought in on the Marines' farm that morning, and Leopoldo had just taken a bucket of oil from the well and shown it to his wife. Well, appellant and his party found Leopoldo Marines near his home, and appellant and Putgenat got out of their car, approached Marines, and engaged him in conversation, leaving Dilworth in the car. Appellant testified that when he asked Marines if he wanted to sell the royalty, the latter answered in the affirmative, at no time during the ensuing conversation mentioning his wife nor intimating that the royalty was her separate property or that she should be

consulted as to its sale; that appellant offered him $2,500 for the royalty, which he refused, demanding $3,000; that after they had haggled about it for some time, and as it was getting late, Dilworth came up, and finding that appellant had offered $2,500 and Marines demanded $3,000, suggested that they "split the difference," but that Marines refused, whereupon appellant offered and Marines agreed to take $3,000; that the agreement was then entered into clearly and definitely, and Marines promised to take his wife and meet appellant in Luling the next morning and there execute the papers necessary to consummate the agreement; that he offered then and there to pay Marines $1,500 or $2,000 as "earnest money," but the latter refused it, solemnly declaring that he would abide by his word without such payment. Appellant was positive in his testimony, and was definitely corroborated by Dilworth as to the agreement having been made as stated in appellant's testimony. Putgenat, although present at the trial, did not testify. We think we have now fairly stated the substance of the evidence relied upon by appellant to sustain his contention that, on the occasion in question, the alleged parol contract was entered into between Leopoldo Marines and himself. Opposed to this evidence was the direct testimony of Leopoldo Marines, only.

We come now to the case as made by appellees. It is based upon the testimony of Leopoldo Marines and, except as to the actual conversation occurring on the 28th of December, upon the testimony of others as well. Upon the question of whether or not the minds of appellant and Leopoldo actually met in agreement on that occasion, we think the record requires us to look not only to Leopoldo's version of that conversation, but to his general attitude at and about the time thereof. It is obvious from the record that Leopoldo is an illiterate Mexican, who speaks English brokenly, while Escolastica, his wife, speaks it not at all. Prior to this transaction they had leased their farm for oil and gas purposes to an operating oil company, reserving a one-eighth royalty interest in any production resulting from the lease. Subsequently, they sold an undivided one-half interest in this royalty, and when they executed the conveyance thereof it was agreed between Leopoldo and his wife that the remaining half interest was to be the latter's and was not to be sold. Both Leopoldo and his wife, and perhaps other witnesses, testified to this circumstance. It was shown by several witnesses, including appellant, that on numerous occasions Leopoldo insisted that his wife was his "partner," and that the remaining interest in the royalty was hers, or, at least that he could not dispose of it without her concurrence; that they must "see her" if they wanted to buy it. The jury found that this interest was not in fact the

separate property of the wife, but in our view this finding is immaterial here. It is not inconsistent with the other finding that the alleged agreement to sell was not made, as appellant insists it is. But the facts raising this issue are important. we think, as bearing upon the question of whether or not the minds of the parties actually or even substantially met in that agreement. Leopoldo is an unlettered Mexican, as stated. He seemed to have his own peculiar notion of the relative interests of husband and wife in the common property. It is a matter, of course, that he was not familiar with those rights and interests as fixed by our statutes. His idea seemed to be that they were "partners"; that as he had sold a half interest in their royalty she, his "partner," was entitled to the other half, or at least that he could not dispose of it without her consent. This was a crude but wholesome attitude, or theory, of marital fairness, and even if it did not assume the form of a legal conveyance, he lived up to·it with the most obstinate fidelity and unswerving consistency. We think this attitude of Leopoldo Marines should be kept in view in weighing his testimony as to what occurred in the conversation on the 28th of December. If that was his attitude in all subsequent dealings with appellant, then the jury could properly consider it in determining the issue of fact of whether Marines on that occasion undertook upon his own responsibility to make a definite sale of the royalty without reference to his wife. He testified in minute detail as to what was said by and between the participants in that conversation, and consistently and persistently denied making the alleged agreement. Appellant, as stated, testified that on that ocasion Leopoldo said nothing of his wife's alleged ownership of the royalty, or of any necessity of consulting her, but entered into the agreement without any reference to her. Dilworth does not appear to have affirmatively testified upon the precise point, or at least appellant has not pointed out such testimony; but he directly corroborated appellant's statement that Marines made the agreement claimed by appellant. Putgenat, as stated, although present and participating in the conversation, did not testify. Leopoldo's testimony was full, positive, and unmistakable in its purport and effect. According to his version of the conversation, he repeatedly told both appellant and Putgenat, who was also urging him to make the deal, that he had no royalty to sell, that the royalty belonged to his wife, and that they must see her. He patiently listened to the arguments and inducements of those seeking to persuade him, but he would not in turn argue with them. At every importunity he simply sought refuge in the monotonous formula: "I ain't got nothing to sell. You will have to see may wife." He thus decribes the conclusion of the conversation:

"Then Mr. Moore say: 'Well, Marines, what are you going to do now?' I say: 'I don't know.' He say: 'I would like to talk to your wife.' I say: 'You will have to see my wife.' Mr. Dilworth say: 'Now it is getting late. We had better go.' and Mr. Moore say: 'Marines, can't yóu talk to your wife about this?' I say: 'Yes, if you want me to I will talk to my wife.' He say: 'Sure enough?' I say: 'Yes.' He say: 'When?' I say: 'Some time to-night.' He say: 'When can you let me know what your wife say?' I say: 'To-morrow.' He say: 'Well, Marines, I want you to talk to your wife and tell her what I want to buy and what I offer you for $1/32$.' I say: 'All right.' He say: 'Can't you talk to your wife?' I say: 'Yes.' He say: 'Marines, sure enough?' He say: 'You will talk to your wife?' I say: 'Yes.' I say: 'I will give you my word I will talk to my wife to-night.' I say: 'Good-bye.' He say: 'Good-bye.' "

Now, appellant testified that Marines agreed to bring his wife to Luling the next morning and close the deal, but Marines denies this. He was in Luling the next afternoon, however, and was hailed by appellant, who charged him with having failed to meet the latter that morning as agreed, and who demanded that he perform, whereupon he stated he could not go ahead with the deal because his wife would not agree to it; that at appellant's suggestion, to which Marines agreed, appellant, accompanied by his attorney and again by Putgenat, went to appellees' home for the purpose of persuading Leopoldo's wife to agree to the trade; that on reaching appellees' home they talked to the latter.

"We probably talked to her 25 minutes, or probably half an hour; it was quite a little while. He brought her out on the gallery before us and talked to her, but she did not speak any English. In that conversation, speaking of the trade, he said he was willing to go on with it. He repeated back to us what was going on between him and his wife, and said that she was not willing to make the trade; that she was not satisfied with the trade; and that she had been his partner and he did not want to make her do it. He said she had been his partner all the way through, and he did not want to make her do it."

Appellant further testified that—

"I think it was some time the following week I saw Marines and discussed this trade with him. About the same occurred at that time; he saying that his wife was not willing to make the trade and that he could not do it. He never did deny that he had made the agreement with me as I have detailed it here."

We have set out the testimony in unusual detail in deference to the contention so ably and earnestly urged by counsel for appellant that the jury's finding upon the issue was manifestly against the weight of the evi-

dence, etc. But we are unable to sustain this contention. In connection with the direct and positive testimony of Leopoldo Marines that he did not make the outright agreement to sell, the jury was privileged to and no doubt did consider his attitude toward his wife's rights in the transaction as he construed them. According to his wits, he had no right to act without his "partner's" consent, and having this limitation as much in his mind as in his heart, his mind may never have gone out to meet the minds of those who sought to bind him to the alleged contract. This interpretation of Marines' expressed attitude may appear to be largely conjectural, but it appears to us to be justified by the evidence, and the jury was warranted in considering it in weighing Marines' direct and positive testimony that he did not make the alleged agreement, but consistently referred his adversaries to his wife. The jury not only heard all the witnesses in person, but saw them and observed and gauged their words and manner and conduct, and being thus favorably situated, they reached the conclusion from all the facts and circumstances in evidence that the minds of John W. Moore and Leopoldo Marines did not meet in agreement on the occasion in question, and that therefore no contract was made as alleged. To decide this very issue was peculiarly within the province of the jury, and there being direct and positive testimony to support their finding we are without authority to set it aside. Accordingly, we overrule appellant's first proposition and the assignments thereunder.

[3] Appellant sought to secure a new trial upon the ground of newly discovered evidence embraced in the proffered testimony of three witnesses, B. F. Beaty, M. L. Manford, and R. Walcowitch. It is alleged that Beaty and Manford would testify upon another trial that on the morning of December 29, Leopoldo Marines proposed to them to exchange a part of the royalty involved for certain land belonging to Manford, and that in the conversation on that occasion he did not intimate that the royalty belonged to his wife. This testimony was unimportant and immaterial. So far as the contrary appears from the record, Marines may have consulted his wife and agreed with her that the deal he is alleged to have proposed to Beaty and Manford would have been advantageous and satisfactory to her, for in that instance Marines was seeking the proposed trade; whereas, in this case of appellant the proposition came from the latter in the nature of a surprise to Marines, who had had no opportunity to consult his wife. The proffered testimony is of a negative nature, is of no importance, would not probably have changed the result of the trial, and would not warrant the granting of a new trial. Moreover, appellant made no effort to show that he exercised the slightest diligence to

discover or produce the testimony upon the trial, and for that reason the motion was insufficient. Both these witnesses were present at the trial, and Manford actually testified in the case. It was shown in the motion that the proposed witness Walcowitch would testify that about the time of this transaction he was informed by Putgenat that appellant had informed him that the latter had made the alleged contract with Marines, and that the latter had failed to carry out the contract; that a few days later he asked Marines why he did not carry out his contract with appellant, stating that the latter "would sue him and he would be in trouble," to which Marines replied that "his word was as good as that of Mr. Moore"; that Marines did not deny that he had made the contract. This proposed testimony is wholly immaterial and valueless. The purpose of it is to show that Marines did not deny to the witness that he had made the alleged contract with appellant. Well, he certainly was under no obligation to the witness to deny or affirm his agreement with a third person. Walcowitch was an outsider, an interloper, who without apparent excuse intruded himself into Marines' private affairs, and arrogated to himself the duty of lecturing him upon a matter in which he had no concern whatever. Of course, Marines did not enter into an argument with Walcowitch. Why should he? Besides, appellant does not attempt to show any diligence whatever in discovering Walcowitch and his proposed testimony. Appellant's second proposition is overruled.

[4, 5] In his third proposition appellant complains of the exclusion of the testimony of his attorney, W. T. Miller, that Frank Putgenat told him he was Marines' agent, and of his own testimony that he first met Putgenat through the proposed witness Walcowitch, who introduced the former as the agent of Marines; "that Putgenat also then and there represented himself as the agent for defendant for the purpose of making a sale of a portion of his royalty and told plaintiff that defendant had requested him to secure a purchaser therefor, and requested plaintiff to accompany him to the home of defendant for the purpose of making a trade." The testimony was objected to as being hearsay. We think the proffered testimony was clearly inadmissible for any purpose. The whole record tends to show that, instead of being an agent of appellees, Putgenat was a partisan of appellant, or else an interloper. There was direct, positive, and uncontradicted testimony that he was not appellees' agent and had no authority to speak for him. In aid of his bill of exceptions, appellant shows and complains that in their jury arguments counsel for appellees commented upon the failure of appellant to put Putgenat on the stand as a witness. We think this comment was fully warranted

by the record. If Putgenat was in possession of information showing or tending to show that he was appellees' agent, or that the royalty was listed with him, or that he had authority from appellees, he was present at the trial, conferred at times with appellant, and the latter should have called him as a witness. But his ex parte declarations made to third parties in the absence of appellees were obviously inadmissible.

Appellant's third proposition will be overruled, and the judgment affirmed.

### On Motion for Rehearing.

Counsel for appellant have filed a very earnest, dignified, and able motion for rehearing, in deference to which we have carefully gone over the case again. We have particularly examined the evidence upon the issue of whether or not the parties entered into the parol contract set up by appellant. We find that all the material evidence upon that issue was set out fully and fairly in the briefs of the parties, and was conscientiously considered by this court in affirming the judgment of the court below. We adhere to that decision.

Appellant seems to construe the original opinion to hold that Leopoldo Marines' mental interpretation of his wife's legal interest in the property in dispute could be given such effect as to impair the validity of a parol sale to appellant. But we did not so hold; in any event, we did not intend to so hold. We simply held, in substance, that the jury were authorized to consider Marines' attitude in weighing his testimony that he did not in fact enter into the alleged agreement.

The motion will be overruled.